### B. F. LONG v. A. D. WATTS.

(Filed 8 March, 1922.)

**1. Constitutional Law—Taxation—Incomes.**

The authority given to the Legislature by the Constitution of 1868 to tax salaries, incomes, etc., is not affected or repealed by the amendment of 1920, but thereunder additional power is given to tax incomes when the property from which the same is derived is taxed, except in prohibited instances.

**2. Same—Salaries—Judges.**

The constitutional restriction on the Legislature not to diminish salaries of the judges during their continuance in office is still in force, unaffected or disturbed by the amendment of 1920, and though their income from other sources may be taxed, a tax on their salaries during their term of office is to diminish their income from such source in contravention of the express terms of the Constitution, Art. IV, sec. 18, further indicated by Art. I, sec. 8, providing that "the legislative, executive, and supreme judicial powers of the Government ought to be forever separate and distinct from each other."

**3. Same—Courts—Appeal and Error.**

It is the duty of the Supreme Court to pass upon the rights of one of the judges of the State as a citizen thereof, when he, in a case properly presented, denies the constitutional right of the State or one of its desig-

nated agencies, to tax his salary paid to him as one of its judges, as being in contravention of Art. IV, sec. 18, prohibiting the Legislature from diminishing the salaries of the judges during their continuance in office.

#### 4. Same—Increase of Salary.

An increase of the salaries of the judges during a term of office is the fixing of their salary by the Legislature in such amount as in its judgment is a proper compensation for their services, and an attempt by an agency of the Legislature, either under actual or mistaken authority, to impose a tax thereon is an attempt to diminish these salaries during the term of office.

#### 5. Same—Intent—Interpretation of Statutes.

The statute taxing salaries and incomes generally is presumed to have been passed with the knowledge by the Legislature of the constitutional inhibition to diminish the salaries of the judges during their continuance in office, also of the decisions of our courts thereon and the policy of the State in respect thereto, as gathered from the organic law; and where the statute is silent on the subject, the legislative intent will not be construed to authorize its designated agent to diminish such salaries by the imposition of a tax thereon, whether regarded as a tax upon an income or otherwise.

CLARK, C. J., concurring opinion.

APPEAL by defendant from *Devin, J.,* at February Term, 1922, of WAKE.

Civil action to restrain the defendant Collector of Revenue of North Carolina from collecting an income tax out of the official salary of the plaintiff, who is one of the Superior Court judges of the State.

From a judgment in favor of the plaintiff, permanently enjoining the defendant from proceeding to collect said tax, the defendant appealed.

*A. L. Brooks for plaintiff.*
*Attorney-General Manning and Assistant Attorney-General Nash for defendant.*

STACY, J. The plaintiff in this action is now and has been for a number of years the duly elected, qualified, and acting judge of the Superior Court for the Fifteenth Judicial District of North Carolina. His present term of office began on 1 January, 1919, and will continue for a period of eight years. The proposed tax which he calls in question is that which the defendant contends was levied by ch. 34, Public Laws 1921. The position of the defendant is that whatever barrier may have existed heretofore against the collection of such a tax, it has now been

removed by the constitutional amendment of 1920. The scope and purpose of this amendment can best be ascertained from the amendment itself:

"1. Amend Art. V, sec. 3, by repealing the proviso in said section 'that no income shall be taxed when the property from which the income is derived is taxed,' and substituting in lieu thereof the following: '*Provided*, the rate of tax on incomes shall not in any case exceed six (6) per cent,' and there shall be allowed the following exemptions to be deducted from the amount of annual incomes, to wit: for a married man with a wife living with him, or to a widow or widower having minor child or children, natural or adopted, not less than $2,000; to all other persons, not less than $1,000; and there may be allowed other deductions (not including living expenses), so that only net incomes are taxed."

It may not be amiss to note just here that the preceding clause in said amended section, "The General Assembly may also tax trades, professions, franchises, and incomes," was not disturbed by the amendment; and this clause has been a part of the Constitution since 1868. Further, it may be noted that the amendment in no way changed the legislative authority to levy an income tax on salaries in general. It simply removed the prohibition against taxing incomes derived from property already taxed, and limited the maximum rate of such tax to six per cent.

The defendant notified the plaintiff in writing that he, as "Commissioner of Revenue, holds that under the income tax provision of the State Constitution and the statute enacted in pursuance thereof, all officials of the State, including . . . judges of the Superior Courts, are required to list and pay an income tax on their salary." He further added that his department would endeavor in every legal way to secure returns and the payment of such taxes. Upon receipt of this communication the plaintiff, on 28 January, 1922, caused a letter to be addressed to the defendant, calling attention to the grave doubt as to the correctness of his ruling, and asked if he would agree to submit a test case for decision so that the matter might be judicially determined on or before 15 March, 1922, this being the limit for the filing of said returns. "The purpose of this letter," he wrote, "is to inquire if you will not consent that an agreed case may be made up and the matter promptly presented to the courts for determination, so that the State, and its officers as well, may know what their respective duties and rights are as to this matter." This suggestion or request was promptly rejected, the defendant saying: "In my opinion these salaries are taxable, both under the State law and the Constitution, and I will endeavor through the machinery of the law to collect these taxes." Following receipt of this letter, the plaintiff instituted the present suit, asking for

injunctive relief, and again offering, in his complaint, to agree upon the facts and to submit this as a test case for decision. Again his offer was declined. From a judgment in favor of plaintiff, the defendant appealed.

The defendant contends that under ch. 34, Public Laws 1921, every resident of the State is required to list and pay an income tax on his or her net income, and this, he says, by correct interpretation, includes the plaintiff's official salary, there being no express deduction allowed therefor in the statute. Defendant, therefore, contends that the act just mentioned contains a legislative direction and command that he collect such a tax. In reply to this, the plaintiff says that the defendant's construction of the statute runs counter to Art. IV, sec. 18, of the State Constitution, which provides: "The General Assembly shall prescribe and regulate the fees, salaries, and emoluments of all officers provided for in this article; but the salaries of the judges shall not be diminished during their continuance in office."

The question, then, presented for our decision is clear-cut, and it is this: Does a tax levied on plaintiff's official salary amount to a diminution thereof in derogation of the constitutional provision above quoted? If it does, its illegality must be conceded; otherwise, the injunction should be dissolved.

The case, in its ultimate effect and final analysis, involves the power to tax the compensation of all the judges in the State. On account of the individual relation of the members of this Court to the question, thus broadly stated, we can but regret that it might not have been settled in some other way. But the issue is forced, and we must meet it. Jurisdiction can neither be renounced nor denied. The plaintiff is entitled, by clear legal right, to invoke our decision in so far as his own salary is concerned, and this is a matter in which no other member of the judiciary can have any direct personal interest. There is no other appellate court to which, under the law, he or the defendant may go. This much is said, not by way of apology, but in recognition of the proprieties of the situation. No other choice is given to us, and we should be recreant to our duty if, when a cause is submitted by a citizen who alleges that his rights have been violated, or by an officer who wishes to know the law, we should shrink from deciding it. A majority of the members of this Court are owners of real estate in the city of Raleigh, but this would not be a sufficient reason for our declining to hear a case involving a tax levy by the commissioners of said city. *Allen v. Raleigh,* 181 N. C., 453. The only course for us to pursue is to consider the cause upon its merits and to decide it, as in other matters, according to the law appertaining to the case. For this position we have precedents from

other jurisdictions and from the highest Court in the land, all of which will be cited hereafter.

For what purpose did the Convention of 1835 recommend that a clause be inserted in the State Constitution so as to provide that "the salaries of the judges shall not be diminished during their continuance in office?" Attorney-General Batchelor, in 1856, answered this question as follows: "The reason why this amendment was made to the old Constitution, the debates in the convention do not disclose to us; but it must have been that that body, influenced by the lessons of wisdom drawn from the experience of the past, desired to throw around the judiciary another defense and protection against any attack which might be made on it by the other branches of the Government, and to secure it against all influences which might sway it from the fearless, faithful, impartial, and independent discharge of its duties." 48 N. C., 544.

The instant provision certainly could not have been incorporated in the Constitution for the personal benefit of the judges. They come and go and, at most, hold office for but a brief period. The Constitution, on the other hand, was written for a continuing and growing State, and its provisions deal primarily with questions which affect the public weal. Whatever else may be said, it must be conceded that this clause, which forms a part of our organic law, was purposely added thereto by men of wisdom and experience, who understood the spirit and genius of our institutions, and who sought to place the independence of the judiciary beyond the field of controversy or debate. They were not ignorant of the melancholy experiences of the past and of the necessity of providing certain effectual checks and balances in this governmental framework which had been bequeathed to them by the fathers. History had also taught them the useful lesson that there is no surer way of losing the blessings of liberty than by meekly submitting to gradual encroachments, under color of law, and that no better instrument could be employed for that purpose than a weak, timid, and subservient judiciary. On the other hand, they were accustomed to look upon the courts, in this government of laws, as the strongest bulwark which they could devise to stand between them and those who would oppress them.

There is another section of the Constitution which may throw some light on the question now in hand. Art. I, sec. 8, provides: "The legislative, executive, and supreme judicial powers of the Government ought to be forever separate and distinct from each other." This has been said to embody succinctly the judgment of the people of North Carolina in regard to "the great principle of the separation of the powers." In this country those who make the laws determine their expediency and wisdom, but do not administer them. The chief magis-

trate who executes them is not allowed to judge them. To another tribunal is given the authority to pass upon their validity and constitutionality, "to the end that it be a government of laws and not of men." From this great political division results our elaborate system of checks and balances—a complication and refinement which repudiates all hereditary tendencies and makes the law supreme. In short, it is one of the distinct American contributions to the science of government. The people of North Carolina have ever guarded this principle with sedulous care. Indeed, so cautious have they been about its preservation that the veto power over acts of the Legislature has been withheld from the Governor of the State. In this respect, our own Constitution may be considered an improvement over the great model from which it was evidently taken, to wit, the Constitution of the United States.

But we are not without a number of precedents by which we may be guided in our present decision; for similar provisions are to be found in the constitutions of other states, and, indeed, the Constitution of the United States contains a provision to the effect that the compensation of the Federal judges "shall not be diminished during their continuance in office." This is the same language used in our own Constitution, and was evidently the pattern from which it was taken. It would seem, therefore, that we should derive much benefit from ascertaining the meaning and purpose of inserting this parent clause in the National Charter. In this regard, the records of the past may speak for themselves. Alexander Hamilton, writing in defense of the necessity of providing for an independent judiciary, observed: "The executive not only dispenses the honors, but holds the sword of the community; the Legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated; the judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever. It may truly be said to have neither force nor will, but merely judgment. . . . This simple view of the matter suggests several important consequences: It proves incontestably that the judiciary is beyond comparison the weakest of the three departments of power; that it can never attack with success either of the other two; and that all possible care is requisite to enable it to defend itself against their attacks." Federalist, No. 78.

And speaking more directly to the immediate point at issue, he said: "In the general course of human nature, a power over a man's subsistence amounts to a power over his will. . . . The plan of the convention accordingly has provided that the judges of the United States shall at stated times receive for their services a compensation, which shall not

be *diminished* during their continuance in office. This, all circumstances considered, is the most eligible provision that could have been devised." Federalist, No. 79.

At a later period, the following views were expressed by John Marshall, who, if any, in regard to the Constitution, was entitled to speak with the weight of authority: "Advert, sir, to the duties of a judge. He has to pass between the Government and the man whom that Government is prosecuting; between the most powerful individual in the community and the poorest and most unpopular. It is of the last importance that, in the exercise of these duties, he should observe the utmost fairness. Need I press the necessity of this? Does not every man feel that his own personal security and the security of his property depends on that fairness? The judicial department comes home in its effect to every man's fireside; it passes on his property, his reputation, his life, his all. Is it not to the last degree important that he should be rendered perfectly and completely independent, with nothing to influence or control him but God and his conscience? . . . I have always thought, from my earliest youth till now, that the greatest scourge an angry heaven ever inflicted upon an ungrateful and sinning people was an ignorant, a corrupt, or a dependent judiciary." Debates, Virginia Convention, 1829-1831, pp. 616, 619.

But possibly the position here sought to be maintained has not been stated more clearly and forcibly than by Mr. Wilson in his "Constitutional Government in the United States": "It is also necessary that there should be a judiciary endowed with substantial and independent powers, and secure against all corrupting or perverting influences; secure, also, against the arbitrary authority of the administrative heads of the Government.

"Indeed, there is a sense in which it may be said that the whole efficacy and reality of constitutional government resides in its courts. Our definition of liberty is that it is the best practical adjustment between the powers of the Government and the privileges of the individual.

"Our courts are the balance wheel of our whole constitutional system; and ours is the only constitutional system so balanced and controlled. Other constitutional systems lack complete poise and certainty of operation, because they lack the support and interpretation of authoritative, undisputable courts of law. It is clear beyond all need of exposition that for the definite maintenance of constitutional understandings it is indispensable, alike for the preservation of the liberty of the individual and for the preservation of the integrity of the powers of the Government, that there should be some nonpolitical forum in which those understand-

ings can be impartially debated and determined. That forum our courts supply. There the individual may assert his rights; there the Government must accept definition of its authority. There the individual may challenge the legality of governmental action and have it adjudged by the test of fundamental principles, and that test the Government must abide; there the Government can check the too aggressive self-assertion of the individual, and establish its power upon lines which all can comprehend and heed. The constitutional powers of the courts constitute the ultimate safeguard alike of individual privilege and of governmental prerogative. It is in this sense that our judiciary is the balance wheel of our entire system; it is meant to maintain that nice adjustment between individual rights and governmental powers which constitutes political liberty.".

The above quotations are selected to show the purpose, intent, and spirit of the framers of the Constitution and the reasons why they thought the particular provision, now under consideration, should be placed in the fundamental law of the land. The primary purpose of the prohibition against diminution was not to benefit the judges, but to attract good and competent men to the bench and to promote that independence of action and judgment so essential to the preservation of our governmental polity. To quote the language of *Chancellor Kent:* "It tends, also, to secure a succession of learned men on the bench, who, in consequence of a certain undiminished support, are enabled and induced to quit the lucrative pursuits of private business for the duties of that important station."

Conceiving this to be its purpose, and considering it in connection with the pervading principles of the Constitution, we must construe it, not as a private grant, but as a limitation imposed in the interest of the public good. It was placed there by the people themselves, and it must be observed by their representatives. To hold otherwise "would be to affirm that the deputy is greater than his principal; that the servant is above his master; that the representatives of the people are superior to the people themselves; that men, acting by virtue of powers, may do not only what their powers do not authorize, but what they forbid."

In this country, where the law is supreme, those acting in a representative capacity may not substitute their *will* for the will of the people as expressed in the original law. No one man or individual is above the law, and it is the duty of all to obey it.

A tax which indirectly takes from the plaintiff a part of that which, by law, he is entitled to receive for his service is clearly within the prohibition against diminution. Of what avail to him is the part paid with one hand and taken back with the other? Would it not, in reality,

be the same as if such part had never been paid, or had been withheld in the first instance? To borrow an algebraic expression: If $x$ plus $y$ equal $z$, then $x$ minus $y$ must be less than $z$, if $y$ be anything at all. This is self-evident, and so plain "that he may run that readeth it." Habakkuk, 2:2. But why elaborate the obvious? *Cui bono?* It is axiomatic, and universally accepted as a correct principle of law that that which is prohibited from being done directly may not be accomplished by indirection. The people themselves, for reasons which they deemed to be wise and satisfactory, and for their own purposes, have thought it proper to withdraw from the field of taxation the official salaries of their judges. Why should the defendant complain at this? He is but a servant of the people; and it is their will, not his, that is to be done.

But it is asked, Has not the State full power to tax her citizens, one and all? To this we answer, Yes. *S. v. Burnett,* 179 N. C., 741; *Thomas v. Sanderlin,* 173 N. C., 332; *S. v. Lewis,* 142 N. C., 626. Taxation is an incident of sovereign power, and, within the limits prescribed, it may be exercised according to the discretion of those who use it, save in respect to the objects of taxation which, for wise reasons, have been withdrawn from these general powers. The holdings of a judge and his income derived from other sources are proper subjects of taxation. The plaintiff makes no objection to this, but he does complain at the ruling of the defendant, which singles out his official salary as a special object of taxation, contrary to the Constitution which he has solemnly sworn to support.

If the tax in question be prohibited, it can find no justification in the taxation of other incomes in regard to which there is no prohibition; for, to be sure, doing what the Constitution permits affords no license to do what it prohibits. And let it be understood that we are now talking about a tribute, which the Government exacts, and not a gratuity or a voluntary contribution. Those who wish to pay more than the law requires will doubtless be permitted to do so, but this cannot affect the legal questions involved.

It was the evident purpose and intent of the people, when they inserted this clause in the Constitution, to prohibit any and every kind of diminution, direct or indirect, by taxation or otherwise. The Legislature is completely divested of the power to diminish the salaries of the judges in any manner or form whatsoever. Any other construction would do violence to the plain purport of the language employed and render the clause meaningless. The prohibition is general in its terms, and contains no excepting words. The reasons in support of its adoption, as publicly advanced at the time, outweighed those against it; and

its wisdom has never been seriously questioned. On the other hand, time apparently has demonstrated that the Convention, which submitted the amendment, must have been endowed with prophetic vision. Their minds were bent on safeguarding, protecting, and preserving the independence of the judiciary; and this they considered of far more importance to the State than any revenue that could come from taxing the salaries of the judges.

It is true a different interpretation has been sought on several occasions, but each time with the same result. In 1898, Attorney-General Walser ruled that the salaries in question were not subject to a tax, and concluded his opinion with the following statement: "I deem it unnecessary to add anything to the able, convincing, and elaborate opinion of Attorney-General Batchelor hereinbefore referred to." Public Documents, 1899, Document No. 8, p. 95. Again, in 1902, Attorney-General Gilmer, in a full and exhaustive opinion, advised the members of this Court and the judges of the Superior Courts that their salaries were not subject to an income tax under the clause in question. This opinion was considered in conference and met with the unanimous approval of the members of the Supreme Court. "It was then resolved that the Court would consider this opinion of the Attorney-General as settling the matter therein discussed, to the same extent as if it were the opinion of this Court." *In re Taxation of Salaries of Judges,* 131 N. C., 692. See, also, *King v. Hunter,* 65 N. C., 603.

In *Purnell v. Page,* 133 N. C., 125, it was held that the State could not tax the salary of a Federal judge under the clause in the United States Constitution from which the one in our own Constitution was taken, and the above opinions were cited with approval and declared to be established law in that case. This amounted to a judicial dictum, which is more than an *obiter dictum.* 15 C. J., 953. And later, *Mr. Justice Walker,* writing in the case of *R. R. v. Cherokee County,* 177 N. C., 97, had the following to say: "In *Purnell v. Page,* 133 N. C., 125, it was held that the income of a Federal judge could not be taxed by the State, and *vice versa,* and that any attempt by the Legislature to impose such a tax would be futile, and when properly questioned would be declared void, and this position was conclusively maintained in a strong and able argument by the present *Chief Justice,* who referred to the opinions of Attorney-General Batchelor, adopted by the Supreme Court, composed then of *Nash, C. J.,* and *Pearson* and *Battle,* judges (48 N. C., 544), and that of Attorney-General Gilmer, 131 N. C., 692, approved by the Court as denying the power of the Legislature to tax the salaries of the judges, which would plainly be a diminution of them, forbidden by the Constitution."

Finally, in the case of *Evans v. Gore,* 253 U. S., 245, the United States Supreme Court (opinion filed 1 June, 1920) has set the matter at rest by holding that, under the above mentioned clause in the Federal Constitution, Congress was without authority to subject the salaries of the Federal judges to an income tax, citing with approval the above expressions in the North Carolina Reports, together with cases from the states of Pennsylvania and Louisiana. *Hepburn v. Mann* (Pa.), 5 Watts & S., 403; *New Orleans v. Lea,* 14 La. Ann., 194. It would be strange, indeed, for us to hold that the identical words in our own Constitution have a different meaning from those in the Federal Constitution in the face of this decision. Every point now before us seems to have been presented in the *Evans case,* and there decided against the contentions of the defendant here. See, also, the very recent case of *Gillespie v. Oklahoma* (opinion filed 30 January, 1922), where *Mr. Justice Holmes,* writing the opinion, cites the case of *Evans v. Gore, supra,* with approval, and the same reasons stated therein are again followed and reaffirmed.

Of all the states in which this question has been before the courts for decision, Wisconsin alone, in *Wickham v. Nygaard,* 159 Wis., 396, has taken the opposite view. This case, however, was decided in 1915, before the decisions of the United States Supreme Court in *Evans v. Gore, supra,* and *Gillespie v. Oklahoma, supra.*

But it is urged that the Legislature of 1921 increased the plaintiff's salary, and, therefore, the same or any subsequent Legislature may levy a tax against it without incurring the charge of having diminished it during his continuance in office. This argument is based on the contention that by adding an additional sum, the Legislature may then tax the whole so long as the tax does not exceed the increase. Or, to state it differently, the theory of the argument is that because the Legislature thought it necessary and proper to increase the plaintiff's salary, therefore they have the right, notwithstanding the constitutional prohibition, to take it away. That the power to add carries with it the power to subtract, at least to the extent of the addition. This would entirely destroy the constitutional provision we are now considering, frustrate its purpose, and make it indeed a snare and a delusion. Any construction which tends to defeat or to nullify a fundamental principle of constitutional law, come from whatever source or quarter it may, is palpably unsound. *Commonwealth v. Mathues,* 210 Pa. St., 400. The Constitution is not to be so easily discarded. The moment the increase took effect it became as much a part of the plaintiff's salary as the original amount, and the whole was then protected by the constitutional

prohibition against diminution. An undiminished salary is a complete salary in its entirety and not a salary less a tax.

Again, it may be well to note that the amount of the tax can make no difference in dealing with the principle we are now discussing. If it be conceded that the Legislature has the power to levy the proposed income tax up to 6 per cent, it follows that a privilege or vocational tax, without limit, may be imposed on the judges; and this would destroy the constitutional provision now in question. The instant clause was adopted by the people themselves, and meaningless words were not employed by them in writing their Constitution.

Furthermore, we do not think it was the intention of the Legislature that the proposed tax should be collected. It was composed of wise and patriotic men, able and learned lawyers, and the present salaries of the judges were fixed by them with reference to the existing constitutional provisions. There was no suggestion by any member of the Legislature that these salaries should be taxed; and, of course, they were aware of the fact that they would not be, as the law had been construed otherwise. This was the basis and understanding upon which the different members of the Legislature arrived at what they thought would be a fair, reasonable, and adequate compensation. Therefore, to sustain the tax the will of the Legislature, as well as the above provision of the Constitution, must be set at naught. It is the duty of this Court to declare that such may not be done by executive order or departmental decree.

The amount of the proposed tax in the instant case is negligible, but the principles involved are important, and for that reason we may be excused for having treated the matter somewhat at length.

Prior to the amendment of 1920, the plaintiff's salary was on a parity with revenue derived from property already taxed. Neither was subject to an income levy, simply because the Constitution provided otherwise. The prohibition against levying an income tax on the latter has now been removed, but as to the former it still stands. This is an irresistible and incontestable conclusion to be derived from a reading of the plain words of the Constitution, and we are not at liberty to disregard its provisions. On the contrary, we have endeavored to show that the restraint in question is not only wise, and in keeping with the spirit of our institutions, but was adopted for reasons of the highest public policy. To speak of it as a technicality is a misnomer. There are no technicalities in the Constitution in the sense that term is ordinarily used.

After a careful and earnest consideration of the record, we answer the questions propounded as follows:

Is the plaintiff's income subject to tax? Yes. In this respect he stands on the same footing with other citizens of the State.

Is his official salary to be included in his taxable income? No. The Constitution clearly and plainly provides otherwise. ✓

Let it be understood henceforth that this is the law as it is now written; and it can make no difference whether the tax be levied before or after the taking of office. The spirit as well as the letter of the Constitution must be observed. The judgment of the Superior Court, permanently enjoining the defendant from collecting the proposed tax on the plaintiff's official salary, was clearly correct. What the State pays or allows for his services as a judicial officer is not a proper item to be included in his taxable income.

Affirmed.

CLARK, C. J., concurs in all that is said in the opinion of *Stacy, J.*, and adds: There is no provision of law or the Constitution that purports to exempt the income of judges from taxation. What the Constitution provides, and which no statute can repeal, is that "the compensation" which the law shall allot from time to time for the support of the judges "shall not be subject to diminution." It can make no difference in what way the reduction in the allowance to the judges shall be made, or whether it is before or after the salary is fixed. When the Legislature has fixed the amount which they deem necessary as a salary for the support of the judges, they cannot diminish that amount in any mode. A tax upon a salary is necessarily a diminution of it.

This provision grew up in the wisdom of experience, because it was essential for the well-being of the public that those selected for the judicial function, who are to pass upon the delicate relations between man and man, and between the Government and the individual, shall be free from any possibility that the amount allotted for their support may be in the power of a hostile party, or a manipulated faction, in the legislative department who might at will reduce the means of livelihood of the judges.

The power to tax is not only the power to destroy, but whatever department in the Government can levy or reduce or impose taxes is the controlling power, and to guarantee to the judicial departments of the State independence in the discharge of the duties to which the people have assigned them, the Constitution provides not that the income of any judge is exempt from taxation, but that "the salaries of the judges shall not be diminished during their continuance in office"; and to say that the imposition of taxes upon that salary would not be a diminution of the salary is a proposition that no man can assert in the presence of any taxpayer.

Formerly the judges in England were removable at the will of the executive. This made the king an absolute monarch at a time when the kings claimed also the right to share in the levy of taxes. The conflict between the executive and the legislative power over the question of taxes brought about the great civil war in England, the decapitation of one king, and the exile of another.

When the power of taxation was transferred by the revolution of 1688 to the legislative department, and as a further guarantee the kings were deprived also of the right to veto legislation, there still remained the power in the king to control the action of the courts by the appointment and removal of the judges. When the American Constitution was framed, the necessity of the absolute independence of the three departments of Government—legislative, executive, and judicial—was asserted, and to secure the latter from absolute subjection by removal from office at the will of the executive, they were declared irremovable except by impeachment; and to avoid their subjection to the legislative department their independence was guaranteed by a provision that while their salaries, or their allowance for necessary support, were necessarily fixed by the Legislature, once fixed they could not be reduced, and, of course, if their salaries could be taxed for any purpose this provision would be a nullity.

In 1862, in the crisis of the great Civil War, when *Chief Justice Taney* and a majority of the Supreme Court were faced by a hostile majority in Congress, this provision was disregarded by a statute. That court rose equal to the occasion, and maintained the vital guarantee of judicial independence conferred upon them by the Constitution of 1787. *Chief Justice Taney* promptly called the matter to the attention of Salmon P. Chase, then Secretary of the Treasury, and one of the leaders of the opposite political party, and asserted the determination of the court to uphold this constitutional guarantee of the independence of the judges in a most vital respect. *Judge Chase,* although a strong partisan (and later *Chief Justice* of the Court himself), valued his oath of obedience to the Constitution and the absolute necessity of an independent judiciary which would become a dependent one if the legislative department could at will reduce its compensation. He abandoned the attempt to exert the power of Congress to diminish by taxation the "fixed" compensation allowed to judicial officers.

There the matter rested, until recently an attempt was again made to place the judiciary in the power of Congress by asserting the right to reduce their compensation. The matter was brought before the Court within the last two years in *Evans v. Gore,* 253 U. S., 245, and the bulwark of the independence of the judiciary was unqualifiedly sustained in that case.

In this State, while we had adopted the .English guarantee of the irremovability of the judges at the will of the executive, we did not place in our Constitution at Halifax, in 1776, a guarantee of the independence of the judiciary by forbidding legislative reduction by taxation, or otherwise, of the salaries allotted. In the third decade of the last century there were legislative threats to coerce the judicial department, and when the Convention of 1835 met, the people of this State wisely saw fit to put in their Constitution the guarantee of the independence of the judiciary in the same words that had been placed in the U. S. Constitution, nearly fifty years previously, and which now appears in every Constitution in the country, to wit: "The judges shall at stated times receive for their services a compensation, which shall not be diminished during their continuance in office."

There are but 25 judges in North Carolina whose offices are created by the Constitution, and these only, and seven heads of the Executive Department, are protected by this constitutional guarantee. It is true that the plaintiff's attorney states that the diminution of the aggregate salaries of these judges by this taxation amounts to the sum of only $1,000, approximately, and the widespread discussion by those who would destroy the independence of the judiciary seems based upon the idea that the independence of the judiciary is not worth that much to the public. But the men who framed the Constitution of the United States, and those who amended our Constitution in this respect to conform thereto in 1835, did not estimate the value of a constitutional guarantee by such standard. It is of infinite importance to the people of this State who know what tremendous influence can be brought in time of stress by great aggregations of capital to control legislation, and, if possible, to influence or subject the judges to the tyranny of that power.

It has been asserted that the amendment of 1920 destroyed the long and sacred independence thus guaranteed to the judges. That amendment was submitted in the following words, and has no possible bearing upon the question now before us: "Amend Art. V, sec. 3, by repealing the *proviso* in said section that no income shall be taxed when the *property* from which the income is derived is taxed, and substituting in lieu thereof the following: *Provided,* the rate of tax on incomes shall not in any case exceed 6 per cent, and there shall be allowed the following exemptions, to be deducted from the amount of any incomes, to wit: For a married man with a wife living with him, or to a widow or widower having minor child or children, natural or adopted, not less than $2,000; to all persons not less than $1,000; and there may be allowed other deductions (not including living expenses), so that only

net incomes are taxed." It may be seen at once that this amendment has no reference whatever to the constitutional guarantee that the "compensation" allowed the judge shall not be diminished, but merely strikes out the provision that "the income shall not be taxed when the *property* from which the income is derived is taxed, and *limits* the rate of taxation to 6 per cent, the latter (the limitation) being the real object in view.

The salary of the judges is not derived from "property," but is simply an allowance for their support, and if any is left over at the end of the year, such remnant becomes "property," and is taxable as such, as was held in *Purnell v. Page,* 133 N. C., 129, and this amendment does not in the remotest degree apply thereto in any aspect. Furthermore, if the amendment was not intended for the entirely different purpose of limiting rate of taxation upon the incomes of great corporations and other large aggregations of wealth down to 6 per cent, it has had that effect. In England the income tax is graduated and runs from 1 to 84 per cent, and a heavily graduated income tax has been found absolutely necessary in the United States, France, and other countries, both for the support of the Government and that great aggregations of wealth should be reduced by taxation by graduated scale, while those with small means should be exempted or taxed much more lightly.

When recently the United States Congress reduced the graduated income tax on large amounts from 68 per cent to 50 per cent there was strong censure from the vast body of the people, who felt that the burdens on inordinate wealth should not be reduced; while in this State, almost without discussion, the limitation on the income tax was reduced to 6 per cent! Possibly this was the true object of that amendment, and it can be seen readily that this amendment has no reference whatever to the constitutional provision, which, following the example of the U. S. Constitution, was adopted to guarantee to the judges immunity from hostile legislation in the reduction of their salaries, and which clause in the Constitution remains unaltered.

While the salaries of the judges can be fixed from time to time, it is with the provision that they cannot be diminished. On the contrary, as to the executive officers, who are: the Governor, Lieutenant-Governor, Secretary of State, Auditor, Treasurer, Superintendent of Public Instruction, and Attorney-General—seven officials—it is provided in the Constitution, Art. III, sec. 15, that their salaries shall neither be increased nor diminished during the time for which they shall be elected. This shows an intention on the part of the organic instrument that while those seven officers are protected from a diminution of their

salaries, there is a prohibition against their being increased. There is no such fear shown as to the possible influence of the judiciary who are protected solely against diminution of their allowance.

The history of this State shows that there has at no time been a fear of the possibility of excessive increase in the compensation allowed to the judges. It is a well known fact that the salaries of the highest Court in this State are very largely less than that allowed to the lowest judges on the Federal bench, and that the salaries of the judges of this Court are far less than the average salary allotted even to the judges of the other states, irrespective of size, wealth, area, or population. Indeed, in at least two states the salaries of their state judges are three times higher than the support granted to any judge of this State. Those who created our Constitution were not unaware that there was no fear, and their judgment was correct, of excessive salaries for the judiciary in this State. The object sought, as in the U. S. Constitution, was to protect the judges from being in the power and at the mercy of hostile legislation, which otherwise could diminish the salary of the officers selected by the people to construe and guard the constitutional rights of its citizens.

But it has been said that if the salaries of the judges cannot be reduced they are "a privileged class." This guarantee that they shall not be placed in the power of a possibly hostile Legislature is not given to the judges as a privilege to them, but as a protection to those who need an impartial administration of justice, unaffected by unfriendly influences.

It makes a privileged class only in the same sense as the exemption from State taxation of the salaries of all Federal officers in the State, many hundreds or thousands in number, including the salary of a U. S. Cabinet officer (for the last 8 years), two U. S. Senators, ten Congressmen, three United States judges, hundreds of postmasters and United States officials of all kinds, while the only State officials whose salaries are exempted from taxation are the seven State officers in the Executive Department named in the Constitution, and the State judges referred to in this section of the Constitution, who are at present 25 in number—and the exemption of these few was made for historical and constitutional reasons of sufficient importance to have such exemption placed in the Constitution, not as a compliment or privilege to them, but as a protection to the public at large that they might be free from any possible improper influence in the discharge of their important duties.

The exemption of the salaries of all these Federal officers from State taxation amounts to a very large sum, and makes a very large "privileged class," if that makes such a class. The provision that the salaries of the

judges shall not be diminished while in office no more makes "a privileged class" than the provision in the Constitution which exempts from poll tax all men over fifty years and all women. It is no more a special privilege than Art. V, sec. 5, of the Constitution, which exempts municipal property from all taxation, and also authorizes the General Assembly to exempt property held for educational, scientific, literary, charitable, or religious purposes, libraries, household and kitchen furniture, agricultural implements, and the personal property of every citizen not exceeding $300. This $300 personal property exemption removes from the families of the working people the fear of the sheriff's visit to every little home or farm which may now retain free of taxes the family milch cow, household and farming utensils, etc. This last exemption, though authorized by the Constitution ever since 1868, was not increased from $25 to $300 by statute till certain influences were seeking a restriction of taxation on great incomes by a limitation of 6 per cent, and as soon as that limitation was imbedded in the Constitution there were instantly strenuous but justly unsuccessful efforts to repeal the legislation by which the small belongings of the poor had been exempted by statute to the amount of $300, and it was earnestly sought to again reduce the exemption to $25 when their votes were not needed to restrict the income tax to a limitation of 6 per cent on great masses of wealth.

Prior to the restriction of the income tax to 6 per cent, the power to tax all incomes was in this State as unlimited as it still is under the United States and other Governments, and if the salary of the judges had been taxed, contrary to the plain language of the Constitution, as income, and not protected from diminution by taxation, it would have been possible to have laid any tax whatever upon judges not entirely agreeable to the political or personal views of a majority of any Legislature, and thus have forced their removal. Even though since the limitation of income tax to 6 per cent (though this was done, not for the protection of the judges, but for the benefit of an entirely different class), if the salaries "were subject to diminution" it would still be possible for the Legislature to lay a tax upon a judge as "exercising a vocation or calling," at any rate the Legislature might see fit. The only protection and guarantee to the judiciary department in this State is that wisely laid by the Convention of 1835, copied from the Constitution of the United States, which provides that the salaries of the judges shall not be diminished during their term of office.

It has been said, though not by the distinguished counsel who appeared for the defendant in this case, that this guarantee by the Constitution against the diminution of the salaries of the judges by legislative enactment is "antiquated and a technicality." In this manner the entire

Constitution, built upon the experience of the ages, and providing for the protection of the weaker classes of society against the greed and arrogance of the powerful, would cease to exist by merely labeling any constitutional guarantee "antiquated and a technicality."

The Constitution of a State and of the Union is the very foundation of law and order. It is the protection of the weak against the strong, and safeguards the masses against the machinations of the powerful combinations of selfish interests. It is the bulwark against anarchy, corruption, and the deadly, insidious, and ever-active power of "high finance," but is without strength unless guarded and upheld by an independent judiciary. Thus upheld, the Constitution—State and National —is to the people at large "the shadow of a great rock in a weary land."

Nothing could be more disagreeable to the men whom the people of this State have thought worthy to place in the chief administration of the laws of the State than to have a controversy raised as to the constitutional guarantee of the small compensation allowed them for their support, from hostile attack from whatever source it may come. There is not one of them who would not rather have paid many times over the petty sum demanded by the defendant tax collector in this case but they had their duty clearly marked out before them by an oath to protect the administration of justice, pure and uninfluenced by any hostile power, and to maintain and support the Constitution of the State. Each and every member of the judiciary of this State must feel that they are only the temporary depositories of that power, and that it is their duty to pass it on to their successors protected by the guarantee which is given in the Constitution, not for the benefit of themselves, of their predecessors, or their successors, but as a guarantee that by whomsoever administered there can be no undue influence possibly exerted to control the occupants of the bench.

The Court did not put this provision in the Constitution, but it was inserted by the Convention and people in 1835, in view of its urgent necessity. The Court cannot strike it out because we, or anybody else, might not approve it. We must follow the long-settled construction and the common-sense meaning that to *tax* a salary necessarily "diminishes" it to that extent. The Court is under the Constitution, and cannot change it at will.

The defendant in this case, as appears by the record, when asked to submit to the courts an agreed case for the construction again of this provision of the Constitution, so as to minimize as far as possible the clamor that was being aroused in certain quarters, either to intimidate or to annoy the judges, who were simply doing their duty, curtly refused to do so, and stated that *"he* had decided" that the constitutional provi-

sion did not protect the judges from taxation of their salaries, and that "he intended to collect the amount he had notified them that they must pay."

When, overruling a previous decision of the Tax Commission, the defendant, of his own will, decided to remit to a great corporation the sum of $110,000 in taxes, which must be made good by being collected from other and poorer persons, there was no one to be found then to seek, and he certainly did not ask, judicial review of his act. To make good this $110,000 by collecting unconstitutionally $1,000 a year out of the judges will take 110 years, and if interest is counted it will take between 300 and 400 years—very poor financiering for the Revenue Department.

There can be no vaster or more irresponsible power than this, which can shift at will the burden of taxation from one class to another, without review, in a State which professes to live under "a government of laws and not of men." It can therefore never be known in a legal way whether the conduct of the defendant on that occasion was valid or not. No one seemed called upon to present that great matter to judicial construction for a legal ascertainment of the facts and the law on so great a matter, but when he attempted to destroy the constitutional bulwark for the protection of the courts in their integrity, though the amount was small, the plaintiff, true to his duty and to the best traditions of his profession, and of his office, and to the Constitution that he had sworn to obey, interposed by an appeal to the courts.

Years ago George W. Kirk, when presented with a writ from the courts, treated it with indignity, and said that "it had played out." The people of North Carolina made their reply to that indignity to their Constitution and laws and their judiciary in a manner that will not soon be forgotten.

If the defendant tax collector desired to submit this question to the courts because he thought that the long line of judges had erred, it was his right to do so; and, on the other hand, it is to the perpetual honor of the plaintiff that he met the issue squarely, unintimidated by organized effort put forth to intimidate the courts or to convince the public that they were corrupt. The $1,000 or more which the defendant might have collected by taxation, if the judges of the State had been wanting in courage to face the concentrated abuse that has been heaped upon them, would have been small compensation for this attempted violation of the Constitution, contrary to the uniform decisions of the courts of this State and of the United States.

The paragraph in question was placed in the Constitution of this State, as already said, by the Convention of 1835, being copied from the same provision in the Constitution of the United States, and has been kept unchanged to this date. There was no question raised of its literal

and plain meaning.  Twenty-one years later, in 1856, the reason for it
was stated in an admirable opinion by Attorney-General Batchelor,
approved by that able Court—Frederick Nash, Richmond M. Pearson,
and William H. Battle.  From that hour to this that decision has been
followed, and often reiterated in the Supreme Court of the United
States and by the courts of this State, and always upon the same ground,
that it was a constitutional guarantee to the judges of their independ-
ence, for if it did not mean that its insertion was useless.  Not only has
this been repeatedly decided by a long line of judges, among them many
of the ablest and purest men who have adorned the history of our State,
but they have all acted upon and accepted it as the true and only con-
struction of the Constitution—among them the able and distinguished
gentleman now the Attorney-General of the State, while at one time he
himself occupied a seat upon the Supreme Bench of North Carolina.

In *Purnell v. Page,* 133 N. C., 125, now nearly twenty years ago, the
Supreme Court of this State, in an unanimous opinion by a bench of
five judges, representing both political parties, held: "The Legislature
is presumed to know the law, and when it levied a tax upon incomes
it did not intend to authorize the tax upon incomes exempt by the Con-
stitution of the State or Federal Government from such taxation.  The
act of the officer in attempting to collect such tax is not authorized by
law, and he was properly restrained from selling."  This interpretation
has been approved as late as 177 N. C., 97, and there has been nothing
in the decisions of this Court or of the United States Supreme Court
contrary to the above decisions and conduct of the judges in this matter.

We would impute to the defendant, upon the record, no motive other
than his zeal of increasing his tax collections by the sum of $1,000 or
more, even though this must be done in violation of the Constitution.
The brief of the distinguished counsel for the plaintiff points out that
instead of obtaining this petty sum by violation of the Constitution, the
defendant could largely increase the public revenue, not by violation of
the Constitution, but in accordance with its provisions and decisions
of this and the United States Supreme Court.  The brief says that if
the defendant desired to enforce the Constitution as it is written, and as
he knows it has been decided by the courts of this State and of the
United States, he might well turn to the Constitution, Art. V, sec. 3,
which provides: "Laws shall be passed taxing, by uniform rule, all
moneys, credits, investments in bonds, *stocks,* joint-stock companies, or
otherwise; and also all real and personal property, according to its true
value in money."  The defendant tax collector knows, as every man in the
State should know, that this constitutional provision, which not only all
office holders, but all voters are sworn to obey, is not being complied
with.  To quote the language of the distinguished counsel for the plain-

tiff, "The Constitution demands that a tax shall be paid by corporations upon their property, and that the *holders* of the stock of these companies shall likewise pay a tax on about 800 millions of dollars of 'stocks,' which are allowed to escape taxation in violation of this explicit requirement of the Constitution," and counsel asked that "this be settled by the courts and in accordance with the Constitution and the laws of the State and not otherwise"; and also further suggests that "this defendant might find it consistent with his duty and oath of office to inquire into the status of large property holders of this State and see whether or not they are paying taxes as the Constitution requires, rather than to undertake to collect taxes from those which the Constitution expressly exempts."

To this may be added that while the amendment of 1920 provides that "incomes from property already taxed may be taxed," by recent legislation (sec. 306 (5), ch. 34, p. 210, Laws of 1921) : "Dividends from stock in any corporation, the income of which shall have been assessed and the tax on such income paid by the corporation" shall not be taxed. That is, not only the money invested in "stock" by individuals and others (amounting in this State possibly to 800 or a thousand million dollars) is absolutely exempted from taxation in defiance of the constitutional provision, Art. V, sec. 3, that "all stocks" and other personal property shall be taxed, but it is now further provided that the *income* or dividends received by the stockholders, and which is paid into their pockets from such stock is exempt from taxation in spite of the recent amendment that "incomes derived from property taxed" (even if the stock had been the property of the corporation) shall be taxed. And it further provided, by a more recent act, ratified 15 December, 1921, that banking corporations may deduct from taxation 5 per cent of their surplus and undivided profits, besides, also, the total amount of the surplus and undivided profits invested in State or United States bonds or the bonds of the Federal Farm Loan Banks and Joint-stock Land Banks.

It will be seen that practically all the "canned wealth" of the State is thus exempted from all taxation in violation of the express language of our Constitution. The defendant tax collector, instead of attempting to replenish his funds by $1,000 in violation of the Constitution of this State, and of the decisions of the State and Federal Courts, might add many millions of dollars to his tax collections by obeying the highest law, the Constitution of the State, as plainly and unmistakably set forth and as construed by numerous decisions of this Court to which he has ready access.

If the defendant will thus take steps to execute the requirements of the Constitution as held by many decisions of this Court, the overwhelm-

.ing burden of taxation upon the farmers and laborers and people with small means, all the producers of wealth, will be largely reduced and the burden placed where the Constitution requires it, upon the corporations and others possessed of inordinate wealth who are being permitted by the defendant to enjoy without question, by him, exemptions from taxation contrary to the Constitution which the defendant and all others have taken oath to support.

The above is written upon the theory that the defendant is seeking to uncover and collect taxes that are withheld which the Constitution requires shall be collected, and that by this action the defendant is seeking a decision along that line.

North Carolina is a growing State, increasing in population and wealth, but taxation is increasing to a still greater extent. We need better roads and better schools, and there are ample sources from which to derive revenue for those and all other necessary purposes if properly apportioned according to the Constitution, but when, as there is ground to believe, vast quantities of wealth in idle hands, largely "canned wealth," so to speak, are exempted entirely, as in instances above referred to, contrary to the Constitution, or taxation thereon is limited by an amendment to that effect if not passed for that purpose, there will be continued and growing unrest.

This unrest cannot be met by attempting to exact $1,000 or more illegally from a small class of public servants, nor by the excitement of *propaganda* against them for not yielding a trust placed in their hands, but respecting the conduct of their predecessors and preserving the protection due to those who shall come after them.

The surest guarantee of the prosperity of the people is an equal and a just administration of the law by fearless officers and a just apportionment of the public burdens by taxes graduated according to the capacity of those called upon to contribute and not in an inverse ratio by being placed most heavily upon those least able to resist an unjust apportionment of these burdens.

It appears from the United States financial report that throughout the Union there are thirty thousand million dollars of "tax-free" bonds, which pay no part of the burdens of government. This is in addition to the "stocks," which, in this State, contrary to the Constitution, are also exempted from taxation. In some few states the Constitution does not require, as ours clearly does, that all stocks shall be taxed. It also appears that there are many hundreds of men in the Union with yearly incomes of over one million dollars each, one of them really a resident of this State, but nominally resident elsewhere, with an income of three millions, and therefore not even paying the limited 6 per cent

income tax, and with a capital, gathered up in 30 years, of over 100 millions. Who lost it? At the same time there are 5 millions of unemployed men throughout the country!

As this controversy to collect in $1,000 contrary to law has been largely carried on outside the courts by methods intended to intimidate the judges to decide the matter wrongfully for fear lest they should be charged with being influenced by the petty amount involved, it is not inappropriate that these things should be said. The just and intelligent people of this State can be trusted to decide correctly all questions affecting the public welfare or their rights if the facts are fully and fairly laid before them.