STATE EX REL. CLIFFORD W. GARDNER AND OTHERS
v. MRS. MIKE HOLM AND OTHERS.[1]

January 29, 1954.

No. 36,177.

*J. A. A. Burnquist,* Attorney General, *George B. Sjoselius,* Deputy Attorney General, *Victor J. Michaelson,* Special Assistant Attorney General, for appellants.

*Clifford W. Gardner, William W. Gibson,* and *Edward L. Gruber,* for respondents (relators below).

*E. Luther Melin, amicus curiae,* filed a brief in support of the contention of appellants.

*Gerald T. Mullin* and *Moonan, Moonan, Friedel & Senn, amici curiae,* filed briefs in support of the contention of respondents.

[1]Reported in 62 N. W. (2d) 52.

Frank T. Gallagher, Justice.

At the 1953 session, both houses of our legislature by majority vote passed an act prescribing the salaries of judges of the district court. The legislature thereafter adjourned sine die without any action having been taken on the act by the governor. Contending that under Minn. Const. art 6, § 6, the governor's signature was not necessary to validate such act, relators, as taxpayers and as members and officers of the Minnesota State Bar Association, commenced this action for a writ of mandamus to compel the secretary of state, revisor of statutes, and commissioner of administration to recognize said act as a valid act of the legislature prescribing such salaries. After a trial, a peremptory writ of mandamus was issued by the district court of Ramsey county. Judgment was entered thereon, and this appeal is from such judgment.

First we should dispose of a question which has not been directly raised but is nevertheless involved and has been given much publicity; that is, whether we are competent to hear and determine the case at all. While the members of this court are not directly interested in the case now before us, we must frankly admit that there is such an indirect interest that were it possible to do so we should all be happy to declare ourselves disqualified. Nothing is better established than the principle that no judge or tribunal should sit in any case in which he is directly or indirectly interested. See, Payne v. Lee, 222 Minn. 269, 24 N. W. (2d) 259. However, this principle must yield to the stern necessities of a case; and when there is no other tribunal that can determine the matter, it is the duty of the court, which would ordinarily be disqualified, to hear and determine the case, however disagreeable it may be to do so. The judicial function of courts may not be abdicated even on the grounds of interest when there is no other court that can act. Whatever may be the law in other states, it is clear that under our constitution there is no provision whereby we can escape the duty imposed upon us to determine this case. Minn. Const. art. 6, § 3, contains the only provision for the substitution of others for members of this court who are disqualified. As far as here pertinent it reads:

"District judges may act where supreme judges are disqualified. Whenever all or a majority of the judges of the supreme court shall, from any cause, be disqualified from sitting in any case in said court, the governor, or, if he shall be interested in the result of such case, then the lieutenant governor, shall assign judges of the district court of the State, who shall sit in such case in place of such disqualified judges, with all the powers and duties of judges of the supreme court."

Unfortunately, here the judges of the district court are more directly interested in the case than we are, so obviously we could not abdicate in their favor.

This proposition is, however, nothing new. See, Payne v. Lee, *supra*. The general principle is stated in 30 Am. Jur., Judges, § 55, as follows:

"By the great weight of authority, the rule of disqualification must yield to the demands of necessity, and a judge or an officer exercising judicial functions may act in a proceeding wherein he is disqualified by interest, relationship, or the like, if his jurisdiction is exclusive and there is no legal provision for calling in a substitute, so that his refusal to act would destroy the only tribunal in which relief could be had and thus prevent a determination of the proceeding."

In Evans v. Gore, 253 U. S. 245, 247, 40 S. Ct. 550, 551, 64 L. ed. 887, 890, 11 A. L. R. 519, the Supreme Court of the United States had before it a case involving the question whether the salaries of federal judges were subject to federal income taxes. With respect to the court's right and duty to determine the matter, the court said:

"* * * Because of the individual relation of the members of this court to the question, * * * we cannot but regret that its solution falls to us; and this although each member has been paying the tax in respect of his salary voluntarily and in regular course. But jurisdiction of the present case cannot be declined or renounced. The plaintiff was entitled by law to invoke our decision on the question as respects his own compensation, in which no other judge can have

any direct personal interest; and there was no other appellate tribunal to which under the law he could go. He brought the case here in due course, the Government joined him in asking an early determination of the question involved, and both have been heard at the bar and through printed briefs. In this situation, the only course open to us is to consider and decide the cause,—a conclusion supported by precedents reaching back many years."

In State ex rel. Null v. Polley, 34 S. D. 565, 570, 138 N. W. 300, 302, 42 L.R.A. (N.S.) 788, the South Dakota court said:

"* * * Had we declined to act in such case, plaintiff would have been without a remedy, and defendant, whether his proposed acts were legal or illegal, would be out of reach of the law, and would be a law unto himself. In such cases the rule of disqualification of judges is deemed of less importance than the denial of the constitutional right to a forum in which rights may be adjudicated. And, however, embarrassing the situation may be to us, we are unanimously of opinion that this court should not abdicate its functions and duties in any case, where such action would, in effect, deprive the citizen of his constitutional rights."

See, also, Federal Const. Co. v. Curd, 179 Cal. 489, 177 P. 469, 2 A. L. R. 1202; State ex rel. Wickham v. Nygaard, 159 Wis. 396, 150 N. W. 513, Ann. Cas. 1917A, 1065; Annotation, 39 A. L. R. 1476.

It must follow that, there being no other tribunal to which the case can be submitted, the duty rests on us to determine the issues presented, even though to all of us it is embarrassing to have to do so.

In the final analysis the decision in this case must rest upon the interpretation of the following language used in Minn. Const. art. 6, § 6:

"The judges of the * * * district courts * * * shall receive such compensation at stated times as may be prescribed by the legislature; * * * ."

Art. 4, § 1, defines "legislature" as follows:

"The legislature shall consist of the Senate and House of Representatives, * * * ."

If we were at liberty to consider only these two provisions of our constitution there could be no doubt as to the true meaning of the language used. Clearly, the governor is not part of the legislature. In construing a provision of our constitution, however, we are governed by certain well-established rules. Foremost among these is the rule that, where the language used is clear, explicit, and unambiguous, the language of the provision itself is the best evidence of the intention of the framers of the constitution. If the language is free from obscurity, the courts must give it the ordinary meaning of the words used. This rule was clearly stated in one of the very first cases before our supreme court after the adoption of our constitution. In Minnesota & Pacific R. Co. v. Sibley, 2 Minn. 1 at p. 9 (13 at p. 20), this court, speaking through Mr. Justice Emmett, said:

"In construing a statute or constitutional provision, the great object is to ascertain and interpret so as to carry out the intention of the lawgiver; and as a primary rule, the language used is to be first considered, as being the best evidence of what that intention is; and when the words are clear, explicit, unambiguous, and free from obscurity, courts are bound to expound the language according to the common sense and ordinary meaning of the words."

With respect to the provision then under consideration, the court said (2 Minn. 9 [20]):

"* * * It is only by interpolating words in the constitution which the framers thereof expressly rejected, that any well founded doubt can be entertained as to the meaning of the language used."

In State ex rel. Childs v. Sutton, 63 Minn. 147, 149, 65 N. W. 262, 263, 30 L. R. A. 630, we said:

"* * * Where the language of the constitution is plain, we are not permitted to indulge in speculation concerning its meaning, nor whether it is the embodiment of great wisdom. A constitution is intended to be framed in brief and precise language, and represents the will and wisdom of the constitutional convention, and that of the people who adopt it. It stands, not only as the will of the sovereign power, but as security for private rights, and as a barrier

against legislative invasion. It has been well said that 'the constitution, which underlies and sustains the social structure of the state, must be beyond being shaken or affected by unnecessary construction, or by the refinements of legal reasoning.' "

In that case we quote with approval the following statement of the rule from Newell v. People ex rel. Phelps, 7 N. Y. 9, 97 (63 Minn. 150, 65 N. W. 263) :

"If * * * the words embody a definite meaning, which involves no absurdity, and no contradiction between different parts of the same writing, then that meaning apparent upon the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed. In such a case there is no room for construction. That which the words declare is the meaning of the instrument; and neither courts nor legislature have the right to add to or take away from that meaning. This is true of every instrument, but when we are speaking of the most solemn and deliberate of human writings,—those which ordain the fundamental law of states,—the rule rises to a very high degree of significance. It must be very plain— nay, absolutely certain—that the people did not intend what the language they have employed in its natural signification imports, before a court will feel itself at liberty to depart from the plain reading of a constitutional provision."

Again, in Cooke v. Iverson, 108 Minn. 388, 396, 122 N. W. 251, 254, 52 L.R.A.(N.S.) 415, we said:

"* * * it cannot be assumed that the framers of the constitution and the people who adopted it did not intend that which is the plain import of the language used. When the language of the constitution is positive and free from all ambiguity, courts are not at liberty, by a resort to the refinements of legal learning, to restrict its obvious meaning to avoid the hardships of particular cases. We must accept the constitution as it reads when its language is unambiguous, for it is the mandate of the sovereign power."

See, also, Davis v. Hugo, 81 Minn. 220, 83 N. W. 984; Lindberg v. Johnson, 93 Minn. 267, 101 N. W. 74.

The dispute here arises as a result of the consideration of other provisions of our constitution. Art. 4, § 11, as far as here material, reads:

"Every bill which shall have passed the Senate and House of Representatives, in conformity to the rules of each house and the joint rules of the two houses, shall, before it becomes a law, be presented to the governor of the State."

The article then provides for approval by the governor or for the passage of the bill over his veto by two-thirds of both houses of the legislature.

While the title to art. 4, § 12, deals generally with the appropriations of money, the body of the article itself seems to go further than that. It reads:

"No money shall be appropriated except by bill. Every order, resolution or vote requiring the concurrence of the two houses (except such as relate to the business or adjournment of the same) shall be presented to the governor for his signature, and, before the same shall take effect, shall be approved by him, or, being returned by him with his objections, shall be repassed by two-thirds of the members of the two houses, according to the rules and limitations prescribed in case of a bill."

Although the above statement is broad in its implications, it is clear that not all acts of the legislature must be submitted to the governor. As an example, regents of the University of Minnesota are appointed pursuant to R. S. 1851, c. 28. State ex rel. Peterson v. Quinlivan, 198 Minn. 65, 268 N. W. 858. The selection of regents must be made by the vote of the joint session of the legislature, but the governor has no control over such selection.

It is also clear that there is a vital distinction between the exercise of the lawmaking function and the exercise of those other functions delegated to the legislature which are not strictly speaking lawmaking. Cf. Brooks v. Fischer, 79 Cal. 173, 176, 21 P. 652, 653, 4 L. R. A. 429, where the California court said:

"The governor is not, in fact, a part of the legislature. The constitution provides: 'The legislative power of this state shall be vested in a senate and assembly, which shall be designated "the legislature of the state of California." ' (Const., art. 4, sec. 1.)

"It will be seen, therefore, that the legislature is one thing and the law-making power of the state another. It does not follow that because in other parts of the constitution, as contended by counsel for the petitioner, the term 'legislature,' so far as it applies to the enactment of laws, includes the governor as a part of the law-making power, that such is the effect of the language above quoted with reference to the adoption of city charters. The language of the section itself clearly shows a different intention. It provides for the submission to the legislature, which does not necessarily include the governor, and provides in express terms that the proposed charter shall become effective upon its being approved by the members of that body. It seems to us that this language is so plain and unequivocal that it cannot call for a construction by this court. It is enough that the constitution has so provided."

For a good discussion of this subject, see the case of Warfield v. Vandiver, 101 Md. 78, 60 A. 538, 4 Ann. Cas. 692.

That the framers of our constitution did not intend to grant to the governor a veto over all acts of the legislature is apparent from an examination of art. 5, § 4, dealing with the powers and duties of the governor. With respect to the veto power, this section reads:

"* * * He [the governor] shall have a negative upon all laws passed by the legislature, *under such rules and limitations as are in this Constitution prescribed.*" (Italics supplied.)

Implicit in this language is an exception in those cases where the constitution itself provides that the legislature, quite aside from the exercise of the lawmaking function, shall act without the concurrence of the governor. That, it appears to us, is the situation here.

In one of the early cases to come before the supreme court after the adoption of the constitution, Bd. of Supervisors of Ramsey County v. Heenan, 2 Minn. 281 at p. 284 (330 at p. 333), speaking through Mr. Justice Flandrau who had been one of the most active

members of the constitutional convention and became one of the first associate justices of our supreme court, this court said:

"* * * Such changes as are instituted by the constitution, and departures from established practices when we were acting without any constitution but that of the United States and the Organic Act, must be considered as providing for some deficiency or intended to check some abuse which existed previously in the legislative department."

In the light of that statement by one who took an active part in choosing the language used in our constitution, a brief reference to comparable provisions of our organic act may help to shed some light on the intention of the framers of our constitution. Organic Act 1949, § 4, reads in part:

"* * * That the legislative power and authority of said Territory shall be vested in the governor and a legislative assembly. The legislative assembly shall consist of a council and house of representatives."

Section 11 provided for a fixed annual salary for members of the supreme court and also for the governor.

In their wisdom the members of the constitutional convention obviously did not find it advisable to retain in the constitution a fixed compensation for either judges or the governor. It is significant, however, that they provided that the compensation of the judges should be "prescribed by the legislature" but that as to all other officers, including the governor, it should be "prescribed by law."[2]

In framing our constitution the delegates had several courses open to them. They could keep the judicial branch of government completely independent of both the legislative and executive branch by fixing the compensation in the constitution itself, reserving unto the people the right to determine any change therein, as was done

[2]See, art. 4, § 7, as to members of legislature; art. 5, § 5, as to executive officers; art. 6, § 7, as to judges of probate court; art. 6, § 8, as to justices of the peace; art. 6, § 13, as to clerk of district court.

in several of the early constitutions of other states;[3] they could grant to both the legislative and executive branches the same control over judicial salaries as they had over most other matters by providing that salaries should be fixed by law, as they did with respect to the compensation of all other constitutional officers; or they could give to the legislature plenary power to prescribe such compensation, thereby keeping the judicial branch of government independent of the executive. It is obvious that this last is what they did.

In drafting our constitution the delegates to the convention had before them the constitutions of many other states, among which was that of Iowa.[4] In framing the constitution of Iowa in 1857, the merits of fixing a salary by the constitution or fixing it in some other way were debated at great length.[5] The final result was a compromise whereby the compensation was fixed by the constitution until 1860 "after which time, they shall severally receive such compensation as the General Assembly may, *by law*, prescribe."[6] (Italics supplied.) It is interesting to note that the first amendment proposed did not include the words "by law" but that after further discussion those words were included in the draft finally adopted. We must assume that the framers of our constitution intentionally omitted the words "by law."

It may also be of some significance that that part of § 4 of the organic act stating that the legislative power shall be vested in the governor and the legislative assembly was dropped entirely whereas that defining the legislative assembly was retained in the definition of the legislature in the constitution.

---

[3]See, for instance, Michigan Const. 1850; Wisconsin Const. 1848, which established minimum only.

[4]See, Minnesota Constitutional Debates, Francis H. Smith, reporter, pp. 195, 207, and 395; Anderson, History of the Constitution of Minnesota, note, p. 131.

[5]See, 1 Constitutional Debates of Iowa 1857, pp. 479 to 493 and 504 to 507.

[6]See, Iowa Const. 1857, art. 5, § 9.

When the delegates to our constitutional convention convened, after the original attempt to organize, they split into two factions, one composed of members of the Republican party and the other members of the Democratic party.[7] Each proceeded to draft a constitution. At the end, a conference committee from both groups met and agreed upon a common draft. The judiciary article was taken from the draft of the Democratic group verbatim. It is interesting to note that the draft of the Republican group provided:

"The judges of the supreme and circuit courts of this State shall receive at stated times a compensation which shall not be diminished during their continuance in office."[8]

No provision is found therein that such compensation shall be "prescribed by the legislature," whereas the original draft of the Democratic wing contains such provision,[9] and it was adopted by the joint committee.

The Democratic wing of the convention was composed of many men who had wide experience in governmental affairs. 1 Folwell, A History of Minnesota, p. 403, has this to say of the qualification of these men:

"* * * Nearly one-half of the members of the Democratic body were or had been federal or territorial officials or members of the legislature. Sibley's long experience in the public affairs of the territory, his parliamentary training in the national House of Representatives, and his personal grace and dignity fitted him for the office of president, to which he had been unanimously elected. Of legal talent there was an abundance; the most eminent in that regard were easily Moses Sherburne and Lafayette Emmett. The adroit Rolette was on the roll, as was 'the veritable Joe Brown,' most skillful of all in the usages of conventions and legislatures."

[7]See, 1 Folwell, A History of Minnesota; Anderson, History of the Constitution of Minnesota.

[8]See, Minnesota Convention Debates, T. F. Andrews, reporter, p. 335.

[9]See, Minnesota Constitutional Debates, Francis H. Smith, reporter, p. 490.

Many of the men who were delegates to the convention were familiar with the constitutions of other states. The reports of committees were debated at length. Folwell, on p. 404, says:

"* * * The reports of the committees as they came in were so fully discussed and amended in committee of the whole as to leave little for the houses to do but give the articles as reported their final passages."

In the light of such experience and training it is only reasonable to conclude that they fully understood the meaning of the language they used and intended the legislature alone to determine the compensation of the judges as the language so clearly implies. Had they not so intended, it would have been a simple matter to use the same language as was used with respect to all other constitutional officers or to have adopted the draft proposed by the Republican wing of the convention.

Appellants would now have us hold that, in spite of the clear meaning of the words used, the framers of our constitution did not really mean what they said; that even though they used different words in providing for compensation of the judges and other constitutional officers, each having a separate and distinct meaning of their own, they meant to use these different words to say the same thing. To so hold is to ascribe to these men, well versed in the use of the English language and familiar with legal precedents, an ignorance of the meaning of words which they used that is neither justified by history or experience. It seems clear to us that they meant just what they said and that the language used is so clear and unambiguous that there is no room for judicial construction.

Nor are we lacking in judicial precedents for so holding. A similar question came before us in State ex rel. Smiley v. Holm, 184 Minn. 228, 238 N. W. 494. We were there construing Minn. Const. art. 4, § 1, and U. S. Const. art. I, § 4, providing for the election of representatives and senators to the United States congress. With respect to the composition of our legislature, we there said (184 Minn. 236, 238 N. W. 498):

"* * * Under our state constitution the legislature consists of the senate and the house of representatives. We believe the word is ordinarily so understood. The frequent expression that our state, like the nation, has three branches of government, executive, legislative, and judicial, is seldom, if ever, understood as meaning that the governor is a part of the legislative."

It is true that our decision in that case was reversed by the United States Supreme Court, Smiley v. Holm, 285 U. S. 355, 52 S. Ct. 397, 76 L. ed. 795, for the reason that the United States Supreme Court concluded that, in providing for elections of members of congress, the legislature, as that word is used in the United States Constitution, was exercising lawmaking power and that, in the exercise of that function, the governor, under our constitution, had a part. In construing the federal constitution it is, of course, elementary that the interpretation placed thereon rests exclusively with the United States Supreme Court. However, our construction of our own constitution is controlling, and the construction placed thereon in the Smiley case still stands as far as it relates exclusively to our fundamental law.

Appellants further argue that by a process of practical construction we should now hold that the governor has such veto power.

It is clear that the framers of our constitution granted to each of the three co-ordinate branches of government certain powers and intended that they should remain independent of each other. Art. 3, § 1, makes this crystal clear. It reads:

"The powers of government shall be divided into three distinct departments—legislative, executive, and judicial; and no person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others, except in the instance expressly provided in this constitution."

No unchallenged exercise of a power not granted to a branch of our government can serve to confer upon it such power when the clear language of the constitution either denies to it such power or confers such power upon another branch of government. Resort may be had to practical construction only when the language is

ambiguous. Where there is no ambiguity, the mere failure to challenge the use of a power not conferred by the constitution cannot confer it upon a branch of government.

This rule is well stated in 11 Am. Jur., Constitutional Law, § 80, as follows:

"* * * it has been thoroughly established that acquiescence for no length of time can legalize a clear usurpation of power where the people have plainly expressed their will in the Constitution and appointed judicial tribunals to enforce it. It has been shrewdly pointed out that a power is frequently yielded to merely because it is claimed and that it may be exercised for a long period in violation of the constitutional prohibition without the mischief which the Constitution was designed to guard against appearing or without anyone being sufficiently interested in the subject to raise the question. Such circumstances cannot be allowed to sanction a clear infraction of the Constitution. The rule of practical construction is of no value in construing a Constitution when it is plain that the practice has been in open violation of that instrument."

In State ex rel. Smiley v. Holm, 184 Minn. 228, 241, 238 N. W. 494, 500, we said in that regard:

"Appellant calls our attention to the fact that on seven occasions prior to voting upon the measure now under consideration the legislature of this state has made state and federal reapportionments in the form of a bill for an act which was approved by the governor. We are of the opinion that such procedure as disclosed in appellant's brief is insufficient to support the claim of practical construction."

The rules pertaining to practical construction are so well stated in State ex rel. University of Minnesota v. Chase, 175 Minn. 259, 272, 220 N. W. 951, 956, that we need only repeat what we said there:

"* * * A practical construction of anything written—constitution, statute, or contract—is but an aid to interpretation, not to be resorted to unless such an aid is required. In a real but broad sense, it is true that 'words always need interpretation; that the process of interpretation inherently and invariably means the ascertainment

of the association between words and external objects; and that this makes inevitable a free resort to extrinsic matters for applying and enforcing the document. * * * All the circumstances must be considered which go to make clear the sense of the words.' 5 Wigmore, Ev. (2 ed.) § 2470(3). But when that sense is made or becomes plain, the process of interpretation ends. In construing a constitutional provision or any writing, first resort is to letter and spirit. That implies application of writing to subject matter. If without going farther the meaning is plain, interpretation is at an end. Resort cannot then be had to the extraneous to obscure what is already clear, and so start again the process of construction and excuse resort to further extraneous aids. The extraneous or subsequent cannot be resorted to as a means of refuting what is inescapable from the instrument itself in application to its subject. It is not then permissible to adopt any different practical construction of a constitution, however long continued or well established, or however distinguished its authorship. Hence, every authoritative statement of the doctrine of practical construction makes it applicable only in a case of doubtful meaning. See for example, Springer v. Philippine Islands, 277 U. S. 189, 48 S. Ct. 480, 72 L. ed. 845. The doctrine is allowed its 'full legitimate force * * * to solve in its own favor the doubts which arise on reading the instrument to be construed.' 1 Cooley, Const. Lim. (8 ed.) 151. It may illustrate or confirm, explain doubt or expound obscurity, but 'it can never abrogate the text, it can never fritter away its obvious sense, it can never narrow down its true limitations, it can never enlarge its natural boundaries.' 1 Story, Const. (5 ed.) § 407.

"Where the controlling words have a definite meaning and involve no absurdity or self-contradiction, 'then that meaning apparent upon the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed. In such a case there is no room for construction. * * * Neither courts nor legislatures have the right to add or to take away from that meaning. * * * It must be very plain, nay, absolutely certain, that the people did not intend what the language they have employed, in its natural

signification, imports, before a court will feel itself at liberty to depart from the plain reading of a constitutional provision.' State ex rel. Childs v. Sutton, 63 Minn. 147, 150, 65 N. W. 262, 30 L. R. A. 630, 56 A. S. R. 459, quoting from Newell v. People, 7 N. Y. 9, 97. Compare State ex rel. Putnam v. Holm, 172 Minn. 162, 215 N. W. 200. Were the courts, simply because of its extended duration, obliged to follow an erroneous practical construction of a plain provision of it, a constitution could be amended without consulting the people. Nothing is farther from the basic theory of our government. 'When the meaning and scope of a constitutional provision are clear, it cannot be overthrown by legislative action, although several times repeated and never before challenged.' The delay in presenting the question is no excuse for not giving it full consideration and determining it in accordance with the true meaning of the constitution. Fairbank v. U. S. 181 U. S. 283, 311, 21 S. Ct. 648, 45 L. ed. 862."

Again, in State ex rel. Peterson v. Quinlivan, 198 Minn. 65, 68, 268 N. W. 858, 860, we held that, even though for a long time "pursuant to statutes passed under a misconception of fundamental law" regents of the University of Minnesota have been appointed by the governor, which was contrary to the constitution, the mere fact that they had been so appointed would not justify a practical construction of the constitution holding that they must be so appointed.

Where the words used in the constitution are clear and unambiguous in their meaning, the constitution cannot be amended under the guise of practical construction. That, in effect, would be the result if we applied such construction to the language under consideration here.

Historically, too, there is good reason for believing that the framers of our constitution did not intend to grant to the executive any control over the judiciary by giving him control of their compensation. At the time our United States Constitution was adopted the people were reluctant to grant to the executive a veto power over the acts of the legislature. At that time only one state had provided for a veto by the governor of legislative bills, namely, Massachusetts. New York had provided for a veto by a council of revision composed

of the governor, the chancellor, and the judges of the supreme court, or any two of them together with governor.[10] The veto power was not freely given to the governor in the early days of the commonwealths.[11] As our country moved westward and our states were admitted to the Union, the people responsible for framing their constitutions retained their reluctance to grant to the governor sweeping powers over the legislature.[12]

The reluctance to grant unlimited powers to the executive was manifested in other ways as well. The pardoning power, which historically had been an executive function, was given to the governor in the draft of both wings of the convention. In the debate on this provision one of the delegates, Mr. Setzer, said:

"* * * I will state that the pardoning power has been much abused in several of the States where it has been vested solely in the hands of the Governor. * * * This is a most dangerous power to vest in the hands of one man, and I hope some check will be placed upon it."[13]

Mr. Stacey, another delegate, said:

"* * * the pardoning power is a power which has been as much abused as any connected with the Executive office. All who have observed the exercise of that power by Executive officers will concur with me, that some restrictions should be imposed. I am willing to give the Governor power to pardon criminals, but I am in favor of restricting it as much as possible."[14]

The objection apparently persisted, for by amendment in 1896 the pardoning power was vested in a board of pardons consisting of the

[10]See, Smiley v. Holm, 285 U. S. 355, 368, 52 S. Ct. 397, 400, 76 L. ed. 795, 801; 3 Thorpe, American Charter Constitutions and Organic Laws, 1893-1894.

[11]See, 1 Thorpe, Constitutional History of the American People, p. 85.

[12]See, Anderson and Lobb, History of the Constitution of Minnesota, p. 33; 1 Forseth, History of Minnesota; "The Wisconsin Story" printed in 1948 by The Journal Company of Milwaukee, Wisconsin; 1 Buley, The Old Northwest Pioneer Period 1815-1840, p. 79.

[13]Minnesota Constitutional Debates, Francis H. Smith, reporter, p. 379.

[14]*Ibid.*, p. 382.

governor, attorney general, and chief justice of the supreme court. 2 M. S. A. p. 152; L. 1895, c. 2.

Appellants contend that State ex rel. Putnam v. Holm, 172 Minn. 162, 215 N. W. 200, 54 A. L. R. 333, recognizes the power of the governor to veto acts of the legislature prescribing judicial salaries. The case is not in point. The issue raised here was neither presented nor considered in that case.

Nor is the fact that this act of the legislature was passed as a "bill for an act" fatal. We have already decided that issue in State ex rel. Smiley v. Holm where we said (184 Minn. 241, 238 N. W. 500) :

"The fact that the legislature voted upon the subject matter in the form of a bill is not controlling. Form does not control. We look to the substance. They voted upon the particular measure. No one misunderstood. The issue was clear. They definitely gave their assent to and expressed their determination fixing definite lines, accomplishing the redistricting as they saw fit."

There remains for decision only one other issue indirectly involved. After passage of the act prescribing judicial salaries by both houses of the legislature, a bill for an act to appropriate money to pay the increase in salaries was passed by both houses of the legislature. The governor failed to sign the bill. Appellants contend that, inasmuch as it appears that the executive has a veto over appropriation bills, that is an indication of similar authority to veto acts of the legislature prescribing the compensation of judges. With that we cannot agree. Art. 4, § 12, provides in part:

"No money shall be appropriated except by bill."

Art. 4, § 11, reads in part:

"Every bill which shall have passed the Senate and House of Representatives, in conformity to the rules of each house and the joint rules of the two houses, shall, before it becomes a law, be presented to the governor of the State."

It must be admitted that the language of these two constitutional provisions is as clear to us in meaning as the language of the pro-

vision above construed. Under these constitutional provisions the governor clearly has the right to veto any bill appropriating money. We do not agree, however, that the two acts are one. Prescribing the compensation of judges is one act. Appropriating the money to pay it is another. Money must be appropriated to pay the salaries of judges each biennium. Whether the money appropriated for payment of judicial salaries at this session of the legislature is sufficient to last through the biennium is quite beside the point. It is hardly conceivable that salaries of judges should go unpaid.

We therefore hold that the act of the legislature in prescribing the salaries for judges of the district court was complete without the signature of the governor and that the decision of the trial court should be affirmed.

Affirmed.