## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 97-IA-01214-SCT

*PUBLIC EMPLOYEES RETIREMENT SYSTEM*

*OF MISSISSIPPI (PERS)*

*v.*

*ARMIS E. HAWKINS*

### ORDER

This matter has come before the Court en banc on Motion for Rehearing filed by the Public Employees Retirement System of Mississippi (PERS), seeking rehearing of the decision on the merits rendered by the Court in this cause. Having considered the motion, the Court has determined that its opinion in the matter should be withdrawn and that the Motion for Rehearing should be dismissed as moot.

Now, having further considered the propriety of their further participation, Presiding Justice Banks and Justices Waller and Cobb, upon issuance of this Order, recuse themselves from further participation on the merits of the case. Although no motion for recusal has been filed in this case, Chief Justice Prather, Presiding Justice Pittman and Justices Smith and Mills heretofore elected not to participate in the decision on the merits of the case. Presiding Justice Sullivan, who did participate is now deceased. Concurrently with the issuance of this Order, the Court is issuing an order finding that there are insufficient Justices available to form a quorum of the Court for further consideration on the merits of the case and directing that, unless the attorneys in the case can agree upon members of the bar to serve as Special Justices, the Governor should be advised of the need to commission others to serve in this case.

IT IS THEREFORE ORDERED, that the opinion rendered by this Court in this cause be and the same is hereby withdrawn and that the Motion for Rehearing is dismissed as moot, and that the undersigned further recuse themselves from further participation on the merits of this case.

SO ORDERED, this the 17th day of October, 2000.

/s/ Fred L. Banks, Jr.

FRED L. BANKS, JR., PRESIDING JUSTICE

/s/ William L. Waller, Jr.

WILLIAM L. WALLER, JR., JUSTICE

/s/ Kay B. Cobb

KAY B. COBB, JUSTICE

BANKS, P.J., FILES SEPARATE STATEMENT ON ORDERS JOINED BY WALLER AND COBB, JJ.

McRAE, J., DISSENTS FROM THE WITHDRAWAL OF THE FORMER OPINION AND THE APPOINTMENT OF SPECIAL JUSTICES AND FILES SEPARATE STATEMENT ON ORDERS.

DIAZ, J., DISSENTS FROM THE WITHDRAWAL OF THE FORMER OPINION AND THE APPOINTMENT OF SPECIAL JUSTICES AND FILES SEPARATE STATEMENT ON ORDERS.

PRATHER, C.J., PITTMAN, P.J., SMITH AND MILLS, JJ., NOT PARTICIPATING.

### BANKS, PRESIDING JUSTICE, STATEMENT ON ORDER:

¶1. I write briefly to elucidate further this Court's action and to respond to the dissenting opinions of Justices McRae and Diaz.

¶2. First, a majority of the en banc Court remaining to hear this matter following initial recusals, to wit, Justices Waller, Cobb and I, decided, upon reflection and in consideration of the motion for rehearing, that the better course was to withdraw the opinion previously issued, which I authored, and to recuse themselves from a decision on this case. Our recusal left this Court without a quorum to hear this case. It followed that the provision in the constitution designed for this situation was, of necessity, invoked. Miss. Const. art. 6, § 65.

¶3. This is not unprecedented. In fact, it was the norm in the early years of our constitution when there were but three Justices and when there was no provision for a quorum. *See, e. g., **John E. Hall Comm'n Co. v. R. L. Crook & Co.***, 87 Miss. 445, 40 So. 1006 (1906); ***Adams v. Mississippi State Bank***, 75 Miss. 701, 23 So. 395 (1897). The quorum provision and the addition of a greater number of Justices have made the instances where the constitutional provision had to be invoked understandably rare. Miss. Const. art. 6, §§ 145A & 145B. ***Slush v. Patterson***, 201 Miss. 113, 29 So. 2d 311 (1947). It is, of course, the rare case where a majority of the Court feels compelled to recuse. However, this is just such a case. Once that fact is realized, our course of action pursuant to our constitution is clear.

¶4. Thus, the arguments pressed by Justice McRae are inapt. Our constitution itself answers both his separation of powers claim and his rule of necessity claim. The cases upon which he relies deal with either a different constitution or with situations wholly inapposite to what is before this Court today.

¶5. Justice Diaz's position has facial merit, but an assignment to the Court of Appeals would involve an assignment by Justices who have recused themselves, running afoul of our admonition in ***Banana v. State***, 638 So.2d 1329, 1331 (Miss. 1994). Additionally, such an assignment would likely cause us to confront this question again on a petition for certiorari to review the Court of Appeals' decision.

¶6. It clearly would have been better for all of the recusing Justices to have done so sooner rather than later. The failure to do so, however, does not relieve us of the obligation to search our consciences and the law in an effort to do that which ought to be done. *See* Miss. Const. art. 6, § 165; Miss. Code of Judicial Conduct Canon 3 C. That which ought to be done is, in our view, what we do today.

**WALLER AND COBB, JJ., JOIN THIS STATEMENT.**

**McRAE, JUSTICE, DISSENTING FROM WITHDRAWAL OF THE FORMER OPINION AND APPOINTMENT OF SPECIAL JUSTICES:**

¶7. This interlocutory appeal simply involves a procedural matter, which is whether former Chief Justice Armis E. Hawkins has exhausted his administrative hearing before PERS or to affirm the trial court's ruling that Hawkins is now entitled to a trial based on the facts of this case. There are only two issues involved. One, whether he has to have an administrative hearing and, two, due process to both parties. The trial judge said that he is entitled to go forward and have his day in court. We stayed the trial court ruling to decide this issue only. We, therefore, took an interlocutory appeal and delayed Hawkins's case for approximately three years. This case is not on the merits at this time. That will be decided at a later date, if Hawkins is still alive.

¶8. Today four justices who had not participated in the original opinion voted to withdraw the published opinion, along with the three remaining justices who choose now to recuse. This Court granted a discretionary interlocutory appeal three years ago involving a procedural matter at the trial court level. Instead of standing behind its published decision affirming the trial court and remanding Hawkins's case to be heard on the merits, this Court chooses to ask the Governor (executive branch) to appoint seven special justices to sit with the two non-recused justices to hear this case.[1] If we had not granted the interlocutory appeal and affirmed the trial court's ruling that Hawkins was entitled to a trial, his case would have been decided and in all probability now be before this Court on its merits, instead of now being further delayed for perhaps another two or three years. What has changed since this Court first granted this interlocutory appeal that now makes these three justices unfit to participate in this case today? The greatest miscarriage of justice lies in the fact that the "substitute justices" will be asked to rule on a case in which this Court has already rendered a decision. Are we not the last stop on the road to justice in this state? Justice delayed is justice denied. Today's order is somewhat misleading in showing only the votes of five justices, when, in fact, after the original opinion was published, all nine justices participated, discussed and voted on the issues present in the order. A majority of this Court voted to withdraw a previously decided and published opinion and force the Governor to appoint seven new justices. It does not take a rocket scientist to know how those not named voted.

¶9. Regardless of the decision made by the new justices, the precedent being set today will surely cause the judicial branch to go from a slow grind to an outright screeching halt. In the present case, Justice Hawkins, as well as the retirement board - but more so Hawkins - **still** has not had his day in court. He has asked for additional retirement benefits. At this rate Justice Hawkins will be dead before anyone ever hears this case on its merits. We do a disservice not only to Justice Hawkins but to every other citizen of this state who wishes to bring his grievances before this Court.

¶10. Today is a very grave day in the judicial system, for it marks a change of over one hundred years of precedents involving our Constitution and statutes. This Court, consisting of nine members and formerly consisting of less, has never done what has been done today. This Court over the last several years, but more importantly now, has drifted from its constitutional moorings and now finds itself in uncharted and troubled waters. I have been asked by the other members of this Court to embark on a journey from which there is no return. In keeping in good faith with the people who elected this writer to this position, I cannot in good conscience join the other members of this Court on their uncharted travel to recuse and ask the executive branch for help.

¶11. We cannot say this will be an isolated incident, never to happen again. This Court chooses to shirk its jurisdictional duties and yield to the executive branch on an issue that has already been discussed and resolved. Did this Court not find itself competent to hear and rule on this case two years ago?

¶12. We are setting potentially dangerous precedent. State courts, along with the United States Supreme Court, have dealt with similar situations, taking a much more bold and prudent stance.[2] They have used the rule of necessity or simply put- the buck stops here!! Federal courts across the country have also followed suit.[3]

¶13. The U.S. Supreme Court adheres to what is called a rule of necessity. Essentially, "the buck stops here." The rationale behind the rule of necessity was put best by United States Chief Justice John Marshall in *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 5 L.Ed. 257 (1821), writing that a court:

> [m]ust take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by, because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid; but we cannot avoid them.

*Id*. at 404, 5 L.Ed. at 403.

¶14. Such a stance has been taken by the lower courts in Mississippi. The circuit and chancery judges are called upon often on appeals from the board of supervisors or where the county has an interest in the case. The court is compelled to render a fair decision, and we presume that it does so. We have put that system in place to allow the trial courts to do it. Not only have we done it, but the statute itself allows such an action. Does that now mean that once this occurs that this precedent changes those proceedings where you have to get a circuit or a chancery judge outside the district to hear all cases?

¶15. This Court should follow the lead of other courts in this state and the United States Supreme Court by applying the rule of necessity. Because on the state level, the buck does stop with us. We are the last, the highest court in this state, and being a rural state we are going to know some people. Some cases may come closer to some justices, as in the case today. But as Chief Justice Marshall said, we cannot merely avoid those questions and decline jurisdiction. This Court held many years ago that the fact that a judge has a "general interest in a public proceeding which he feels in common with the mass of citizens, does not disqualify him." *Ferguson v. Brown*, 75 Miss. 214, 21 So. 603, 606 (1897).

¶16. Justice Hawkins was the Chief Justice of this Court. He was known by many on the Court who worked with him, including this writer. Hawkins, just like all judges in this state, falls under the same retirement system, but that does not act as a bar to this Court from deciding this case. This is a procedural matter and not being tried on the merits at this point in time. PERS on the other hand is involved with the retirement of most justices and any other judge. The issue presented by PERS in its motion for rehearing is not a novel one. This very issue was discussed when this case was first presented to us on interlocutory appeal. We accepted it and voted on this issue before deciding the case. If this Court felt like it was not in a position to hear this case, that decision should have been made when it was in a position to make such a finding three years ago. Not now, months after handing down a decision and publishing our opinion.

¶17. The Attorney General, years ago and prior to this decision being handed down, asked that each member of the Court consider recusal. Three did. The other six heard the oral arguments of the case and rendered a decision. Now, after this Court has spent much time reading briefs, hearing arguments, and merely deciding whether to allow this case to go to trial, as the trial judge had already ruled, we are choosing the path that leads to further delay.

¶18. For us to accept an interlocutory appeal, which we rarely do, keep this case for quite some time, have three justices recuse themselves, finally render a decision, and then have those very three same justices who once steered clear of this case get back in just to vote to send it over to the Governor for appointment is unjust. We have held before that when a party does not make a timely objection to a judge sitting they will be presumed to have waived any such objections. *Ryals v. Pigott*, 580 So.2d 1140 (Miss. 1990); *Yazoo & Miss. Valley R.R. v. Kirk*, 102 Miss. 41, 58 So. 710, 713 (1912).

¶19. What is also troubling is our apparent stance on the separation of powers doctrine. This will be the first time we have turned the entire judicial power in a particular case over to the executive branch to appoint. It does great violence to the doctrine of separation of powers-a doctrine which has been enshrined in all four of the only Mississippi constitutions that this state has ever had and has been jealously guarded by this Court over the years. *See Alexander v. State ex rel. Allain*, 441 So.2d 1329 (Miss.1983).

¶20. Until now, this Court has steadfastly refused to allow the legislative and administrative branches to usurp its inherent authority as the highest court of this state. A short history of this Court's battles demonstrates that never before have we ceded such power to another branch of government.[(4)]

¶21. The Mississippi Constitution of 1817 set up a supreme court made up of superior court judges sitting in a group. The Supreme Court was to be made up of four judges with any two of them sufficient to constitute a court. The constitution did not specify how the Supreme Court members were to be chosen and, thus, the General Assembly was able to choose to elect the Supreme Court judges, one from each of four districts.[(5)]

¶22. When a new constitution was adopted by the state in 1832, justices of the Supreme Court were to be elected by the people from three judicial districts. In 1852, that Court would face its first controversy when the state legislature authorized the establishment of a state bank (to be called the Union Bank) to be financed by a state bond sale. When the bank ultimately failed, the question of the state's liability for the bonds, became a political issue of great proportion. In 1842 the Legislature repudiated the bonds and the bondholders were forced to take their case to the courts. In *Campbell v. Mississippi Union Bank*, 7 Miss. 625 (1842), the Court upheld the validity of the bond sale and held that the bonds represented a valid debt of the state. The Legislature again repudiated the bonds. A second case concerning the validity of the bonds came to the Supreme Court in 1852. At this point, the debate over repudiation reached a fever pitch. Repudiationists claimed that if the bonds were held to be valid, the state would be bankrupted. Ignoring the political pressure, the Court adhered to the view that the bonds were valid. Nevertheless, the Legislature continued to refuse repayment. The issue was not finally resolved until, in 1933, the Principality of Monaco, holder of $100,000 in bonds, sought leave to file suit against the state in the United States Supreme Court. In 1934, the Supreme Court denied leave to file suit and held that the Eleventh Amendment to the United States Constitution barred Monaco's proposed suit.

¶23. The tension between this Court and the other branches of government continues to this day. Although the Legislature conferred general rule-making power on the Mississippi Supreme Court in 1975 (see Miss.

Code Ann. §§ 9-3-61 to-73 (1991)), the Mississippi Legislature vetoed this Court's proposal to adopt the Mississippi Rules of Civil Procedure. Relying on its inherent authority under the state constitution, this Court adopted the proposed rules on May 26, 1981, effective January 1, 1982. During the 1982 legislative session, the Legislature passed a bill purporting to give the legislature final authority for approving any rule promulgated by this Court. Thereafter the Legislature declared invalid Mississippi Rules of Civil Procedure 3, 12, 13, 41, 47, 49, 56, and 83. The chief justice at the time, Chief Justice Neville Patterson, responded to the Legislature's action by writing a letter to all county, circuit and chancery court judges stating that the Mississippi Rules of Civil Procedure were to remain in effect until further order of the Court. The Legislature has taken no further action. *See 1982 Mississippi Supreme Court Review*, 53 Miss. L.J. 113, 129-30 (1983).

¶24. This Court, under the leadership of Chief Justice Patterson, held years ago that the constitutional concept of separation of powers dictates that it is within the inherent power of this Court to promulgate procedural rules to govern judicial matters, ***Newell v. State***, 308 So.2d 71 (Miss.1975). Later, this Court held that "statutes which conflict with rules adopted by the Court are void." ***Stevens v. Lake***, 615 So.2d 1177, 1183 (Miss. 1993). In the early eighties, threats of impeachment were heard from the legislative branch, and the members of this Court, through Chief Justice Patterson, even employed former Attorney General A.F. Summer to represent them in the event that any impeachment proceedings took place. Fortunately, they never did.

¶25. The lesson in all of this is that this Court has throughout its history zealously guarded against the other governmental branches taking from us the power that is rightfully ours. To willingly cede our authority is a grave mistake; the potential for permanent institutional harm is much too great.

¶26. The Governor and his appointees will reasonably be troubled by the sheer fact that it is apparent that all judges now serving, and retired judges who are drawing their retirement pay from the same system, would have an interest. By the same token, can the public say if any lawyers are appointed for this special case that they will give any fairer treatment knowing that a decision has already been handed down by the state's highest court and recognizing that it is this very Court that controls their license to practice law?

¶27. Just as important is the precedent set by this case which will be perceived as a decree to all potential litigants and citizens of this state that the Constitution and the laws thereof are now hollow in the eyes of this Court. On any given case in which a justice recuses, litigants will have the opportunity to come in and say, "Wait a minute, I want a full nine-member court to hear my case." The case will then be held up, the wheels of justice will come to a standstill, and the Governor will once again be forced to interrupt his duties in order to appoint yet another "substitute justice." Under Article 6, Section 165 of the Mississippi Constitution,[6] the Governor then could add as many justices as often as he wishes. Particular concern will be warranted in cases in which the litigant has strong ties to the Governor, possibly even a supporter, and an earnest push is made for a favorable appointee.[7]

¶28. Our only hope is that litigants, or rather their attorneys, do not choose to take advantage of today's ruling. Though I suspect that each time a justice chooses to recuse our clerk's office will be flooded with such motions and that calls will be made directly to the Governor in hopes of aiding in the selection process of these substitute justices. But more importantly, the executive branch and those friendly to it will be calling asking for certain individuals to take the place of any justice who is not participating whether it is prior to our decision being published or afterwards as in this case. Lawyers are trained to use the system, use the

rules as they have, and follow precedent. Unfortunately, the precedent that we are setting today allows them to do this. We took oaths as lawyers that we would delay no person's case for lucre or malice. Miss. Code Ann. § 73-3-35 (1991). We should stand by that oath as justices.

¶29. This case involves a procedural matter and is not before this Court on the merits at this time. All questions of recusal were present when this Court granted a discretionary interlocutory appeal, took two years to decide it and finally published an opinion holding that the trial court was correct in allowing Hawkins to have a trial. We now shy away from that decision and choose instead to pass it off to the Governor and whatever group of people he may see fit to appoint. This ship of the judiciary should not sail into the waters of the executive branch. It should instead reverse course and drop anchor elsewhere. The buck stops here as the rule of necessity should apply.

¶30. Accordingly, I dissent.

### DIAZ, JUSTICE, DISSENTING FROM WITHDRAWAL OF THE FORMER OPINION AND APPOINTMENT OF SPECIAL JUSTICES:

¶31. I respectfully dissent from the majority's decision to withdraw the original opinion in this matter and substitute an order wherein the attorneys for the parties are encouraged to select an agreed panel of special justices to hear the case, or if that is not feasible, ask the Governor to appoint a special panel of justices to hear the matter.

¶32. Since seven of the justices on this Court find it necessary to recuse themselves from this case, despite no motion to that effect and despite the fact that many of the justices on this Court have participated in some aspect of this case over the last two years, the better option, in my opinion, is for us to assign this case to the Mississippi Court of Appeals. Miss. Code Ann. § 9-4-3 (Supp. 1999) sets forth the jurisdiction of the Mississippi Court of Appeals. This Court "shall retain appeals in cases imposing the death penalty, or cases involving utility rates, annexations, bond issues, election contests, or a statute held unconstitutional by the lower court." *Id.* § 9-4-3(1). Other than these specified types of appeals, this Court may, at any time prior to the issuance of an opinion or ruling disposing of a case or matter before it, transfer a case to the Mississippi Court of Appeals if this Court determines that an expeditious disposition requires such. The case before us today is a routine matter - a dispute over state retirement benefits - which is regularly assigned to the Mississippi Court of Appeals. *See, e.g.*, ***Burns v. Public Employees Retirement Sys.***, 748 So. 2d 181 (Miss. Ct. App. 1999). Furthermore, to encourage the parties to select an agreed panel of justices is unusual, and invoking the unused constitutional provision which seeks a selection by the Governor of a special panel of justices, delays justice where a better and more expedient remedy exists-assignment to the Mississippi Court of Appeals.

¶33. Since this matter is not constitutionally or statutorily required to be heard by this Court, it is a better choice to assign it to the Mississippi Court of Appeals for disposition. Accordingly, I dissent from the majority's decision here today.

1. Evidently an area of concern by this Court is that the outcome of this case would directly affect each member as state employees contributing to the state retirement plan. However, the Governor will be hard pressed to find seven (7) judges in Mississippi not contributing to the state retirement system because all in fact are members.

2. ***Moulton v. Byrd***, 224 Ala. 403, 140 So. 384 (1932); ***Olson v. Cory***, 26 Cal.3d 672, 164 Cal.Rptr. 217, 609 P.2d 991 (1980); ***Nellius v. Stiftel***, 402 A.2d 359 (Del.1978); ***Dacey v. Connecticut Bar Ass'n***, 170 Conn. 520, 368 A.2d 125 (1976); ***Wheeler v. Board of Trustees of Fargo Consol. Sch. Dist.***, 200 Ga. 323, 37 S.E.2d 322 (1946); ***Schward v. Ariyoshi***, 57 Haw. 348, 555 P.2d 1329 (1976); ***Higer v. Hansen***, 67 Idaho 45, 170 P.2d 411 (1946); ***Gordy v. Dennis***, 176 Md. 106, 5 A.2d 69 (1936); ***State ex rel. Gardner v. Holm***, 241 Minn. 125, 62 N.W.2d 52 (1954); ***State ex rel. West Jersey Traction Co. v. Board of Pub. Works***, 56 N.J.L. 431, 29 A. 163 (1894); ***Long v. Watts***, 183 N.C. 99, 110 S.E. 765 (1922); ***First Am. Bank & Trust Co. v. Ellwein***, 221 N.W. 2d 509 (N.D.), ***McCoy v. Handlin***, 35 S.D. 487, 153 N.W. 361 (1915); ***Alamo Title Co. v. San Antonio Bar Ass'n.***, 360 S.W.2d 814 (Tex.Civ.App.1962).

3. ***Atkins v. United States***, 214 Ct.Cl. 186, 556 F.2d 1028 (1977); ***Pilla v. American Bar Ass'n,*** 542 F.2d 56 (8th Cir.1976); ***Brinkley v. Hassig***, 83 F.2d 351 (10th Cir. 1936); ***United States v. Corrigan***, 401 F. Supp. 795 (D. Wyo.1975).

4. Most of this information is taken from John Ray Skates, Jr., *A History of the Mississippi Supreme Court, 1817-1948* (1973).

5. The first district was comprised of Warren, Claiborne and Jefferson Counties; district two was made up of Adams, Franklin, and Lawrence counties; district three was comprised of Wilkinson, Amite, Pike and Marion Counties; and district four was made up of Hancock, Wayne, Greene and Jackson Counties. In 1821, Hinds County was added to the first district, and Monroe County was added to the fourth.

6. Miss. Const. Art. 6, § 165 (1890), states:

> "No judge of any court shall preside on the trial of any cause, where the parties or either of them, shall be connected with him by affinity or consanguinity, or where he may be interested in the same, except by the consent of the judge and of the parties. Whenever any judge of the Supreme Court or the judge or chancellor of any district in this state shall, for any reason, be unable or disqualified to preside at any term of court, or in any case where the attorney engaged therein shall not agree upon a member of the bar to preside in his place, the governor may commission another, or others, of law knowledge, to preside at such term or during such disability or disqualification in the place of the judge or judges so disqualified."

7. Obviously, Art. 6, § 165 (1890 Const.) was enacted because there were only three justices on the court appointed by the governor and if one recused or was unable to serve, the governor would appoint another. Since then, the court was enlarged to nine justices elected by the citizens of this state.